**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | § | |
| LINNEA ROSE | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 2:05 CV 216 |
| | § | |
| v. | § | |
| | § | |
| EAST TEXAS MEDICAL CENTER | § | |
| REGIONAL HEALTHCARE SYSTEM and | § | |
| EAST TEXAS MEDICAL CENTER | § | |
| ATHENS | § | |
| | § | |
| Defendants. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The defendants' Motion for Summary Judgment and Brief (#100) (the "Motion") is before

the court.  For the following reasons, the court GRANTS the Motion.

**I.     INTRODUCTION AND FACTS**

This *qui tam* action is brought pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§3729-

3733, and was filed by the relator under seal on June 8, 2005.  The United States declined to

intervene in this action, and the court ordered the complaint unsealed on February 6, 2007.

Defendant East Texas Medical Center Regional Healthcare System ("ETMCRHS") is a

hospital conglomerate that owns and operates private hospital facilities in East Texas, including

Defendant East Texas Medical Center Athens ("ETMCA").  The relator alleges the defendants

devised and implemented a scheme to fraudulently receive additional Medicaid matching funds from

the United States by illegally abusing the intergovernmental transfers ("IGT") procedure for the

Medicaid Upper Payment Limits ("UPL") Program.

In general, Medicaid is a jointly funded state and federal program that provides medical assistance to needy persons. *See* 42 U.S.C. § 1396 et. seq. ("The Medicaid Statute"). The UPL program allows states to reimburse public rural hospitals for certain uncompensated care provided under Medicaid at an amount equal to what Medicare would have paid for the same service. *See* 42 C.F.R. § 447.272, 66 Fed. Reg. 4148 (2001). IGTs are used to fund, at least partially, the state's contribution to the UPL payments, which can be used to claim additional federal funds. Federal regulations require states to separate UPLs by facility type because public hospitals are reimbursed at a higher percentage than private non-profit hospitals. *See id.*

## A. Background of the Upper Payment Limit Program

The United States partners with state governments to enable states to provide, through Medicaid, medical benefits to persons who do not have access to medical insurance. Although the United States establishes general guidelines for states' Medicaid programs through Centers for Medicare and Medicaid Services ("CMS"), the states establish detailed requirements for administration. CMS, previously Health Care Financing Administration (HCFA), is the federal agency within the United States Department of Health and Human Services ("DHHS") that works with state governments to administer their Medicaid programs.

State Medicaid agencies pay providers, such as hospitals, set rates for medical services provided to those who are covered by Medicaid. Those rates are set by the states and approved by CMS. The Medicaid Statute also provides for hospitals that serve a disproportionate share of Medicaid patients, as well as uninsured patients that do not qualify for Medicaid. These hospitals are eligible to receive additional funds from the state to cover any Medicaid shortfalls. States

2

developed different financing mechanisms to take advantage of the special funds for those hospitals. One mechanism is intergovernmental transfers (IGTs). IGTs are transfers made from one unit of government to another.

Originally, under section 1923 of the Medicaid statute, states had wide discretion to determine how to calculate the amount of the funds to administer to hospitals to cover the shortfalls. It did not take long, however, for Congress to limit those funds to those which did not exceed the actual amount of uncompensated costs. These changes came under what are referred to as the "Provider Tax Amendments," which limited what funds a state could use to finance its part of the Medicaid program. Pub. L. No. 102-234 (adding Section 1903(w) to 42 U.S.C. § 1396b). These amendments responded to a perceived abuse of the system, which allowed states to obtain funds from private entities or specific health care provider taxes, without actually having to contribute to any of the funding.

In 2001 CMS issued a regulation further limiting the amount of reimbursements that could be made to public hospitals by imposing upper payment limits ("UPLs") on aggregate payments to certain classes of hospitals. 42 C.F.R. § 447.272 ( 2002). CMS classified these hospitals as (1) State government-owned or operated; (2) non-State government-owned or operated; and (3) privately owned and operated facilities. 42 C.F.R. § 447.272 (a). Category 2 hospitals had a higher UPL, set at 150% of the same for categories 1 and 3 hospitals.

In 2002, the Texas Health and Human Services Commission ("HHSC"), the administrative agency for Medicaid in Texas, applied to CMS to amend the state plan to provide for supplemental Medicaid payments in accordance with the 2001 CMS regulations. In doing so, the state plan made

the supplemental payments available to "eligible rural public hospitals," further defining such hospitals as those "affiliated with a city, county, hospital authority or hospital district located in a county of less than 100,000 population . . ." 1 Tex. Admin. Code § 355.8069 ("Rule 8069"). The Texas HHSC solicited the Texas Organization of Rural and Community Hospitals ("TORCH") to work in conjunction with HHSC to develop the Texas UPL program.   TORCH is a statewide advocacy and leadership organization with approximately 150 member hospitals throughout Texas. TORCH was not an organization created for the partnership with the State, but existed long before the HHSC-TORCH partnership to set up the UPL program.   In fact, the current General Counsel, Kevin Reed, has served for approximately seventeen years.

ETMC is a Texas non-profit organization that operates ETMCA in Athens, Texas.   It is uncontested that the Athen's hospital facility is owned by Henderson County and leased to the Henderson County Hospital Authority ("the Authority"), which then subleases to ETMC, a private corporation.   On March 18, 2002, TORCH sent ETMCA a letter informing it that "[ETMCA] ha[d] been identified as a potential benefactor of significant additional funding under the Texas Rural Medicaid Upper Payment Limit (UPL) Program . . ." Further, TORCH informed ETMCA that it was one of 27 rural hospitals that qualifies under the program as a "transferring" hospital.

In July of 2002, the Authority had a board meeting with Kevin Reed and executives from TORCH to discuss how to fund the IGTs.   Reed advised ETMCA to transfer funds to a bank account owned by the Authority, and then those funds would be transferred to the state through an IGT. ETMCA was advised that the funds would be matched at 128% and then transferred back.   ETMCA structured several transactions pursuant to Reed's advice.   After this arrangement had been in place for some time, the relator brought this action asserting ETMCA is actually a private hospital making

4

improper provider donations.  According to the relator, ETMCA's conduct in making such IGTs to

obtain reimbursement at higher levels amounts to a false claim under the FCA.


## II.    APPLICABLE LAW

### A.  Summary Judgment

Summary judgment should be rendered "if the pleadings, the discovery and the disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The evidence and

pleadings must be viewed in the light most favorable to the party opposing summary judgment.  *See*

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Summary judgment is proper in a case

where there is no genuine issue of material fact.  *Celotex v. Catrett,* 477 U.S. 317, 322 (1986).  "By

its very terms, this standard provides that the mere existence of *some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby*, 477 U.S.

242, 247-248 (1986)(emphasis in original).

The substantive law identifies material facts; disputes over facts that are irrelevant or

unnecessary will not be defeat a motion for summary judgment.  *Id.* at 248.  A "genuine" dispute

about a material fact means that the evidence is "such that a reasonable jury could return a verdict

for the nonmoving party."  *Id.*

### B.  False Claims Act

The FCA prohibits false or fraudulent claims for payments to the United States and permits

civil actions to remedy such fraud to be brought by private individuals on behalf of the United States. 31 U.S.C. §3730.   To recover under the FCA the plaintiff must demonstrate: (1) the claimant presented, caused to be presented, or conspired to have presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the claimant knew the claim was false or fraudulent. 31 U.S.C. § 3729; *See United States of America v. Medica Rents*, No. 03-11297 at 8-9 (5th Cir. August 19, 2008).[1]  When there is conflicting guidance or multiple interpretations of the law or regulations, a defendant cannot be found guilty of knowingly submitting false claims to the government when it reasonably followed one of those interpretations.  *See Medica*, No. 03-11297, at 8-9.

## III. ANALYSIS

The relator brought this *qui tam* action claiming ETMCA was violating the False Claims Act by knowingly submitting false or fraudulent claims to the federal government for over 15 million dollars of federal Medicaid matching funds.  Specifically, she claims that to participate in the UPL program and receive the federal matching funds, ETMCA masqueraded as a public hospital by first transferring its operating revenue to the Authority's bank account to fund the IGTs.   Additionally, she contends that the transferred funds were improper provider-related donations to fund the non-federal share of the program, and ETMCA knew this was improper.  ETMCA disagrees and argues it is in fact a public hospital for purposes of the UPL program because the facility is owned by Henderson County and leased to the Authority, which then subleases to ETMCA to operate.

---

[1] The court recognizes that *Medica* is an unpublished Fifth Circuit opinion, which is not binding authority.  The court, however, finds the *Medica* case highly persuasive under the facts of the instant case.  *See Moreland v. Federal Bureau of Prisons*, 431 F.2d 180, 185 (5th Cir. 2005) (recognizing the persuasive value of unpublished opinions in the Fifth Circuit).

According to ETMCA, because it is a public hospital for purposes of the UPL program, the funds

used to make the IGTs are not prohibited funds, but authorized "public funds." As discussed below,

the court does not need to decide whether ETMCA is, or is not, a public hospital, or whether the

funds are in fact prohibited provider donations. The only necessary determination to dispose of this

case is whether the evidence is sufficient to raise a genuine issue that the ETMCA knowingly made

a false claim to the government. The court finds that it is not.


## A.  Whether ETMCA is a public hospital

At the heart of whether the IGTs at issue in this case were lawful is whether ETMCA actually

qualifies as a "rural public hospital," and, if so, whether that makes the funds it contributed

necessarily "public." The relator argues that ETMCA was then, and is now, a private hospital for

purposes of the UPL program. To support her position, relator cites the preamble to the 2001 UPL

regulations:

> Facilities fall into the categories of non-State government-owned or operated and
> State government-owned or operated based upon their ability to make
> intergovernmental transfer payments back to the State and based upon the
> governance structure of the facility and who retains ultimate liability for the
> operations of the facility. However, all facilities that are prohibited from transferring
> funds back to the State will fall into the privately-owned and operated category.

66 Fed. Reg. 3151 (Jan. 12, 2001).

The relator argues that ETMCA cannot be a public hospital under the regulations, in light of

the preamble. Specifically, she argues the government does not retain ultimate liability for

ETMCA's operations, and ETMCA does not actually have the ability to make IGTs–but are making

IGTs through the Authority's bank account to "dupe" the State.

7

ETMCA defends that the relator's interpretation is misguided, as it would put them in none of the three categories. A private hospital is defined as "owned *and* operated" privately, and a public hospital is "owned *or* operated" by government. 42. C.F.R. § 447.272. ETMCA argues that a better reading of the preamble would be that the restriction on the governance structure and who retains ultimate liability should be to make a distinction between State-government owned or operated versus non-state government owned or operated. It urges that both, however, would still be "public."

In an attempt to clarify which hospitals actually fell into category 2, CMS issued a 2001 regulation explaining that "the kinds of facilities that fall into this category are county or city-owned and operated facilities, quasi-independent hospitals districts, and hospitals that are owned by local governments but operated by private companies through contractual arrangements with those local governments . . ." 66 Fed. Reg., 3148, 3153-54. ETMCA argues that its lease agreement with the Authority makes it squarely fall into this category, as it is a county owned facility operated by a private company.

ETMCA further argues that the applicable federal regulation allows for hospitals like ETMCA to participate in the program. Specifically, the regulation provides "[w]ithin the context of this regulation, we consider a facility to be subject to the new governmental UPL if it can make an IGT payment to the State (either *directly or indirectly* through a governmental owner or operator, or other arrangement). 66 Fed. Reg. 3151 (emphasis added). ETMCA argues, therefore, making the IGTs through the Authority was appropriate.

To support her position that ETMCA knew that it was a private hospital, the relator puts much emphasis on a prior state tort action in which ETMCA failed to prove it was a public hospital for immunity purposes. In that action, ETMCA argued that it was public because of the lease

agreement with the Authority.  The State Court found that ETMCA was not a public hospital for sovereign immunity purposes.  This argument bears very little weight on the relator's position in this case.  Whether a hospital is public for state tort immunity purposes and whether a hospital is public for purposes of the Medicaid UPL program are two entirely different issues.  Whatever the state court's determination was for sovereign immunity purposes, it does not follow that ETMCA knew it was a private hospital for purposes of participating in the UPL program.  This is especially true since TORCH sent an unsolicited communication to ETMCA advising that it was eligible to participate in the program.

Whether the contractual lease agreement between ETMCA and the Authority is enough to make ETMCA a public hospital is less than clear.  Neither party's interpretation of the law is unreasonable.  Further, ETMCA relied on TORCH's communication that it qualified under the program. ETMCA attempts to call this reliance into question, because ETMCA knew TORCH had a significant financial interest in securing ETMCA's participation in the program.  She argues ETMCA, knowing of TORCH's financial stake, should have sought independent advice on whether it could lawfully participate as TORCH instructed it to.  Even accepting this argument, a defendant must knowingly or recklessly submit a false claim to be liable under the FCA.  ETMCA's reliance on TORCH's advice was not reckless under these facts.  At most it might amount to negligence, which does not rise to the level of the "knowing" scienter requirement under the FCA.  31 U.S.C. § 3729;  *See also, United States of America v. Medica Rents*, No. 03-11297, at 9 (5th Cir. August 19, 2008).

## B.  The funds must be public

The relator also argues that ETMA's operating revenue was not proper to fund the IGT, because that revenue was a prohibited provider donation under the 1991 Provider Tax Amendments. The relator claims that section 1903(w)(6)(A) prohibits these funds, which are derived from ETMCA's operating revenue. The section specifically prohibits the use of "voluntary contributions, and [limits] the use of provider-specific taxes" to get federal matching funds. Additionally,

> The Secretary may not restrict States' use of funds where such funds are derived from State or local taxes (or funds appropriated to State university teaching hospitals) transferred from or certified by units of government within a State as the non-Federal share of expenditures under this subchapter, regardless of whether the unit of government is also a health care provider, except as provided in section 1396a(a)(2)of this title, unless the transferred funds are derived by the unit of government from donations or taxes that would not otherwise be recognized as the non-Federal share under this section.

42 U.S.C. §1396b(w).

The relator also argues that under Rule 8069, concerning the UPL program for rural public hospitals, "[s]tate funding for supplemental payment authorized under this section is limited to and obtained through intergovernmental transfers of city, county, hospital authority or hospital district funds." 1 Tex. Admin. Code § 355.8069. Therefore, she urges, funding the IGTs with ETMCA's operating revenue was necessarily unlawful.

ETMCA relies on its interpretation of the law and regulatory guidance to support its position that the funds are necessarily public because ETMCA is a public hospital, as discussed above. Under its argument, § 1903(w)(6)(B), referring to § 1903(w)(6)(A), provides "[f]or purposes of this subsection, funds the use of which the Secretary may not restrict under subparagraph (A) shall not be considered to be a provider-related donation or a health care related tax." ETMCA's interpretation of this provision is that because 1903(w)(6)(A) allows transfers from units of

10

government, which can be a health care provider, these funds are not considered "provider-related donations," even if the ultimate source of such funds is ETMCA's operating revenue.

ETMCA further relies on regulatory guidance which provides that the statutory provisions "do not include restrictions on the use of public funds as the State share of financial participation." Specifically:

> Funds transferred from another unit of State or local government which are not restricted by the statute are not considered a provider-related donation or health care-related tax. Consequently, until the Secretary adopts regulations changing the treatment of intergovernmental transfer, States may continue to use, as the State share of medical assistance expenditures, transferred or certified funds derived from any governmental source (other than impermissible taxes or donations derived at various parts of the State government or at the local level).

57 Fed. Reg. 55118 (1992).

Finally, ETMCA urges that the funding was appropriate, because under CMS regulation 42 C.F.R. §433.51, the funds were "public funds," coming from a "public hospital," which can be used to fund the non-federal share if those funds were "appropriated directly to the State or local Medicaid agency, or *transferred from other public agencies* (including Indian tribes) to the State or local agency under its administrative control, or certified by the contributing public agency as representing expenditures eligible for FFP under this section."   ETMCA argues that because it is a "public hospital," both because of its lease agreement with the Authority, and because CMS's State Medicaid Manual defines a "public provider" as those "owned or operated by a state, county, city or other local government agency or instrumentality," State Medicaid Manual § 2560.4G.1a(1),  all of ETMCA's funds are necessarily public.  The regulation, however, does not make clear how much "control" the local agency must have to make an a provider "public."  In this case, the Authority did have some control.  Although the relator's reading of the relations is plausible, it was not unreasonable for

11

ETMCA to conclude from this regulation that it was a "public agency," especially in light of the advice from TORCH.

The relator also contends that tax revenues are the only allowable source of IGTs to fund the program. If this is the proper reading of the statute, then the ETMCA is not the only ones misreading it. In commenting on CMS's proposed rule changes[2], the American Hospital Association states:

> Congress included this statutory exception, section 1903(w)(6)(A), to permit states to continue to use state or local taxes to make IGTs. It did not authorize CMS to require states to only use state or local taxes to make IGTs, nor did it preclude the use of other sources of funds, such as patient care revenues."

American Hospital Association's Detailed Comments on CMS-2258-P at p. 11 (March 15, 2007).

Further commenting on those proposed rule changes, seventeen states acknowledge that under the Provider Tax Amendments:

> Many, if not most, publicly owned or operated health care providers do not have taxing authority, and nonetheless have long been able to contribute to state Medicaid programs by using their own funds as the non-federal share of Medicaid expenditures. . .
>
> [T]raditionally, the non-federal share of expenditures by public entities has come not only from these sources but also from other unquestionable legitimate sources, such as . . . earnings from other hospital operations . . .

Joint Comments of the States of Alaska, Connecticut, Illinois, Louisiana, Maine, Missouri, New

---

[2] In 2007, CMS attempted to make changes to the rules that would significantly limit what funds could legitimately fund the non-federal share to certain tax revenue or entities with taxing power. These rules are not relevant to the current case, as Congress put a moratorium on those rule changes, and they were never in effect at any relevant time to this litigation. *See* U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, § 7002(a), 121 Stat. 112 (2007).

Hampshire, New Jersey, North Carolina, Oklahoma, Pennsylvania, Tennessee, Utah, Washington

and Wisconsin to CMS 2258-P at p. 12 (March 19, 2007).

In addition, the National Association of Public Hospital and Health Systems also stated to

CMS:

> In asserting that intergovernmental transfers (IGTs) can only be derived from tax
> revenues, the preamble to the proposed rule ignores the much broader nature of
> public funding.  States, local governments and governmental providers derive
> their funding from a variety of sources, not just tax proceeds, and such funds are
> no less public due to their source.

National Association of Public Hospitals and Health Systems to CMS 2258-P at p.6 (March 8,

2007).

As stated above, there is no need for the court to determine whether the funds must be

derived from tax revenue.  Under these facts, there are multiple interpretations of what funds may

be used to fund the IGTs, rendering suspect the allegations that ETMCA knowingly made a false

claim.  Recently, the Fifth Circuit addressed a very similar issue.  In *United States of America v.*

*Medica Rents*, No. 03-11297 (5th Cir. August 19, 2008), the United States, along with the relators

in that case, brought a *qui tam* action claiming that Medica Rents had submitted false claims by

using the wrong reimbursement codes under Medicare.  *Id.*  Using those wrong codes resulted in

Medica receiving greater reimbursement amounts than it was actually entitled. *Id.* at 5-6.  In that

case, the defendant had relied on several instances of contradictory guidance.  *Id.* at 5.  The court

found there was sufficient confusion in the guidance given to the defendant about which codes

were the proper ones to use.  *Id.* at 9.  The district court, therefore, correctly granted summary

judgment for the defendant, finding that the defendant could not have *knowingly* submitted false

claims in light of the confusion around which codes to use.  *Id.* at 9 (emphasis added).  The

evidence in light of the confusion did "not support a reasonable inference that [the defendant] knowingly submitted false or fraudulent claims." *Id*.

In the present case, there are multiple regulations and sources of guidance that render the underlying law unclear.  Indeed, Scott Reasonover, the relator's own expert was not able to say definitively that the funding arrangement violated the provider donation statute.  Mr. Reasonover testified that he had spent 14 years as a Medicaid reimbursement specialist for the Texas Health an Human Services Commission.  Mr. Reasonover "developed the regulations and state plan for . . . the rural hospital UPL program." (Deposition of Reasonover 10:17).  Specifically, he "designed the reimbursement methodology for the rural hospital UPL program and . . . drafted the state plan amendment and the regulations for the rural hospital UPL program." (Deposition of Reasonover 10:17) Mr. Reasonover would only say that if he had known "the money was coming from the general operating revenue of the East Texas Medical Center and deposited into the Henderson County Hospital Authority and then sent through [the IGT]" it would have given him "pause or concern . . ." (Deposition of Reasonover 66:9-15).  Further, he refused to admit ETMCA was "lulling" the government into thinking it was dealing with a public agency by ETMCA using the Authority's bank account to make the transfer. (Deposition of Reasonover 65:24).  Even more telling, is that after this litigation has been pending for almost three years, when Mr. Reasonover was deposed on April 21, 2008, he still only "has concern" that the transfer may violate the improper provider donation statute, and that he "[doesn't] definitely know that it does." (Deposition of Reasonover 322:23).

It is undisputed that TORCH, the entity *selected by the State* to assist in implementing the program, notified ETMCA that they were identified as an eligible hospital to participate as in the

program as a transferring hospital.   Indeed, Kevin Reed from TORCH advised the board how to

set up the funding mechanism, and ETMCA relied on this advice. As discussed above, the relator

asserts ETMCA should have sought independent legal advice regarding the legality of its

participation in the program, by pointing out that ETMCA knew that TORCH had a substantial

financial interest in securing ETMCA's participation in the program.   The court, however, finds

that ETMCA's reliance on TORCH and its attorneys was reasonable.   ETMCA's failure to seek

independent legal advice under these facts does not rise to the level of reckless disregard needed

for an FCA claim.   At most, it would constitute negligence, which is insufficient to assert a claim

under the FCA.

## IV   CONCLUSION

Based on the foregoing, the court finds that TORCH was selected by the state of Texas to

establish the UPL program for the state, and ETMCA relied on the advice of TORCH's lawyers

that it was eligible to participate in the UPL program and fund the IGTs as it did.   Assuming

*arguendo* that Defendants violated the law in light of the prohibition of provider related

donations, the law lacks clarity in light of the many applicable rules and regulations.   Even

though ETMCA knew that TORCH had a financial interest in establishing ETMCA's

participation, the evidence does not suggest that ETMCA's reliance on that advice was reckless.

At most, not seeking independent counsel was negligent.   Therefore, there is no genuine issue of

material fact that the defendants did not act knowingly with respect to any claims they made.

The court, therefore, **GRANTS** the defendants' motion for summary judgement.   The

case is **DISMISSED** with prejudice.

SIGNED this 25th day of August, 2008.

_____

T. JOHN WARD
UNITED STATES DISTRICT JUDGE